Patrick R. Leverty, Esq.
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| HANS MENOS, derivatively on behalf of ECO SCIENCE SOLUTIONS, INC., | |
| Plaintiff, | Case No. |
| vs. | |
| JEFFERY L. TAYLOR, DON L. TAYLOR, L. JOHN LEWIS, S. RANDALL OVESON, and GANNON GIGUIERE, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| ECO SCIENCE SOLUTIONS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Hans Menos ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of

Nominal Defendant Eco Science Solutions, Inc. ("Eco Science" or the "Company"), files this

Verified Shareholder Derivative Complaint against Defendants Jeffery L. Taylor, Don L. Taylor, L.

John Lewis, and S. Randall Oveson (collectively, the "Individual Defendants"), and Defendant

Gannon Giguiere for the Individual Defendants' breaches of their fiduciary duties as directors and

officers of Eco Science, unjust enrichment, waste of corporate assets, abuse of control, gross

mismanagement, and/or aiding and abetting the foregoing misconduct.  As for his complaint against

1

the Individual Defendants and Defendant Giguiere, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants,[1] United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Eco Science, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Eco Science's directors and officers.

2.      Eco Science is a technology-focused company that targets the health and wellness industry. It develops technical solutions ranging from enterprise software solutions to consumer apps for daily use. The Company's core services span business location, localized communications between consumers and business operators, social networking, educational content, e-commerce, and delivery.

3.      On December 15, 2016, an article published on *SeekingAlpha.com* detailed the Company's involvement in an alleged "pump-and-dump" stock promotion scheme, which consisted of Eco Science paying a third-party to promote and artificially inflate Eco Science stock, despite the Company's mobile app products being practically worthless (the "Stock Promotion Scheme").

---

[1] "Defendants" refers to, collectively, Jeffery L. Taylor, Don L. Taylor, L. John Lewis, S. Randall Oveson, Gannon Giguiere, and the Company.

Verified Shareholder Derivative Complaint

4.     On this news, the price per share of Eco Science fell $0.13, or almost 5%, closing at $2.55 on December 16, 2016.  By the close of market on December 20, 2016, just three trading days after the December 15, 2016 *Seeking Alpha* article was published, the price per share of Eco Science stock had fallen even further to $1.43.

5.     On May 1, 2017, the Company filed an annual report for the fiscal period ended January 31, 2017 on Form 10-K with the SEC (the "2016 10-K"), announcing a plan for strategic acquisitions.

6.     On May 2, 2017, Eco Science entered into a letter of intent to acquire Ga Du Bank, Inc. ("Ga Du Bank"), which was announced by the Company in a May 5, 2017 press release.[2]  The purpose of the acquisition was to enter into the cannabis banking industry.

7.     On May 15, 2017, an additional article was published on *SeekingAlpha.com*, alleging that: (1) the Company was furthering the Stock Promotion Scheme; (2) Eco Science engaged in multiple transactions with entities owned by Defendant Gannon Giguiere to personally benefit him and support the Stock Promotion Scheme at the expense of the Company and the investing public; (3) the Company's announced acquisition of Ga Du Bank involved a bank that "the internet has never heard of" and that the Southern Cherokee Nation Red Fire People's ("SCNRFP") central bank, the central bank that Ga Du Bank was to operate through and be regulated by, perhaps was not a legally recognized Native American tribe; and (4) the Company's touting of the Ga Du Bank transaction was for the purpose of furthering the Stock Promotion Scheme (collectively, the "*Seeking Alpha* Misconduct," and together with the Stock Promotion Scheme, the "Fraudulent Scheme").

---

[2] In its press releases and SEC filings as cited herein, the Company uses the spellings "Ga-Du" and "Ga Du" interchangeably.

Verified Shareholder Derivative Complaint

8.      On this news, the price per share of Eco Science stock fell $0.23, or 9.5%, from the previous day's closing price to close at $2.17 on May 16, 2017.

9.      On May 19, 2017, the SEC issued an Order of Suspension of Trading (the "Order") in the Company's securities and a related release.  The Order stated that "it appears to the [SEC] that there is a lack of current and accurate information concerning the securities" of Eco Science "because of concerns regarding the adequacy and accuracy of information in a company press release dated May 5, 2017 relating to the company's proposed acquisition of Ga Du Bank, Inc."

10.     The Order noted that the SEC "is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company" and thus suspended trading in the Company's securities from May 22, 2017 through June 5, 2017.

11.     On May 24, 2017, the Company filed a current report on Form 8-K with the SEC (the "5-24-2017 8-K") which provided additional information on the Company's proposed acquisition of Ga Du Bank.  It noted, in relevant part, that:

> A press release announcing the letter of intent was issued on May 5, 2017, and it was not clear in the press release that the Ga-Du Bank is operated through the [SCNRFP] Central Bank; approval by the Chief of the SCNRFP for the acquisition of Ga-Du Bank has been given to the Company and that the Company is now working through the due diligence process.

12.     The 5-24-2017 8-K also noted that "[o]nce the due diligence is complete, and approved by the Company, the Company will take further steps to close the transaction." Additionally, "In the event the due diligence is not favorable, the Company will not move forward with the transaction."

13.     On June 6, 2017, the first day Eco Science stock was being traded after the suspension required by the Order, the price per share of Company stock had fallen $1.72, or over 72.5%, from its last closing price, to close at $0.65.

4

14.     On June 26, 2017, the Company filed a current report on Form 8-K with the SEC (the "6-26-2017 8-K") announcing that the Company's due diligence revealed a litany of issues concerning the Company's potential acquisition of Ga Du Bank.  The 6-26-2017 8-K revealed, *inter alia*, that Ga Du Bank's charter (which was provided through the SCNRFP) and ability to engage in some desired commercial operations were not sufficiently developed, that the SCNRFP had made false representations to Ga Du Bank regarding its correspondent and merchant relationships, and that Ga Du Bank, despite indicating otherwise to Eco Science, would not soon have a solution for banking with the SCNRFP.

15.     The 6-26-2017 8-K additionally revealed that the SCNRFP had terminated its relationship with Ga Du Bank, which was the sole avenue by which Ga Du Bank, and therefore Eco Science, was to enter the cannabis banking industry.  Nonetheless, as announced in the 6-26-2017 8-K, the Company entered into a Stock Purchase Agreement on July 21, 2017 to purchase all of the stock of Ga Du Corporation[3] (the "Stock Purchase Agreement") in order to acquire the enterprise solutions and banking platform technology developed by Ga Du Bank related to providing financial banking services.

16.     On September 14, 2017, the Company filed a notification of late filing on Form 12b-25 with the SEC, stating that it was unable to timely file its quarterly report for the fiscal quarter ended July 31, 2017, because Eco Science "has not yet been able to compile all the required financial data for the independent auditor to review."  The Company has yet to file its quarterly report for the fiscal quarter ended July 31, 2017 as of the time of filing of this complaint.

---

[3] Upon information and belief, and as suggested in the 6-26-2017 8-K, Ga-Du Corporation owned and/or controlled the assets of Ga-Du Bank, including all of its developed technologies and enterprise solutions.

Verified Shareholder Derivative Complaint

17.     Defendants J. Taylor and D. Taylor, in breach of their fiduciary duties owed to Eco Science, engaged in and/or caused the Company to engage in the Fraudulent Scheme, and were aided and abetted in the furtherance of the Fraudulent Scheme by Defendant Gannon Giguiere.

18.     Additionally, Defendants J. Taylor and D. Taylor, in breach of their fiduciary duties owed to Eco Science, willfully or recklessly made and/or caused the Company to make false and/or misleading statements and fail to disclose that: (1) they engaged in and/or caused the Company to engage in the Fraudulent Scheme; (2) the Company's strategic acquisitions plan lacked veracity; (3) Ga Du Bank was operated through the SCNRFP Central Bank; (4) the Chief of the SCNRFP had given approval for the acquisition; (5) Eco Science was in the process of performing due diligence for the potential acquisition of Ga Du Bank and had begun this process in early 2017;  (6) Ga Du Bank's charter (which was provided through the SCNRFP) and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (7) the SCNRFP had made false representations to Ga Du Bank regarding its correspondent and merchant relationships; (8) Ga Du Bank, despite indicating otherwise to Eco Science, would not soon have a solution for banking with the SCNRFP; (9) thus, the Company made inadequate and inaccurate public statements concerning its potential acquisition of Ga Du Bank; and (10) the Company failed to maintain adequate internal controls.   As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at the time they were made.   Defendants J. Taylor and D. Taylor also failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

19.     Defendants J. Taylor's and D. Taylor's breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), and the Company's Chief Financial Officer ("CFO") to three federal securities fraud class action lawsuits

Verified Shareholder Derivative Complaint

pending in the United States District Court for the District of New Jersey (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

20.     The Company has been substantially damaged as a result of Defendants J. Taylor's and D. Taylor's knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty and/or aiding and abetting thereof engaged in by the Individual Defendants, all of whom are the Company's current directors and are its controlling shareholders, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Nevada or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one

Verified Shareholder Derivative Complaint

or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Eco Science. Plaintiff has continuously held Eco Science common stock at all relevant times.  Plaintiff is a citizen of New Jersey.

### Nominal Defendant Eco Science

26.     Eco Science is a Nevada corporation, and its registered agent is National Registered Agents, Inc. of NV, which is located at 701 S. Carson St., Suite 200, Carson City, Nevada 89701. Eco Science's principal executive offices at 1135 Makawao Avenue, Suite 103-188, Makawao, Hawaii 96768.  Eco Science's shares trade on the OTCQB Venture Market ("OTC") under the ticker symbol "ESSI."

### Defendant J. Taylor

27.     Defendant Jeffery Taylor ("J. Taylor") has served as the Company's CEO and President since December 2015.  He has also served as the Company's Secretary and as a Company director since January 2016.  According to the 2016 10-K, as of March 31, 2017, Defendant J. Taylor beneficially owned 13,047,019[4] shares of the Company's common stock, which represented approximately 28.76% of the Company's outstanding shares.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $3.39, J. Taylor owned over $44.2 million worth of Eco Science stock.

---

[4] According to the Company's Form 8-K filed with the SEC on October 6, 2017, Defendant J. Taylor agreed to return 8,000,000 personal shares of Eco Science common stock to the Company for cancellation, effective September 22, 2017.

28.     For the fiscal year ended January 31, 2017, Defendant J. Taylor received $8,305,000 as compensation from the Company, which included $115,000 as base salary and $8,190,000 in stock awards.

29.     The Company's 2016 10-K stated the following about Defendant J. Taylor:

Mr. Jeffery Taylor[5]

As CEO, Mr. Jeffrey Taylor will oversee the company's strategy, technology roadmap, and consumer community content development programs; Mr. Taylor is a recipient of the Army Commendation Medal from the United States Army during service of operation Uphold Democracy; he served in the United States Army for 10 Years and focused on supply chain management technologies with an emphasis on logistics and distribution of specialty materials.  Mr. Taylor was discharged with a Medical Discharge; Mr. Taylor has been a real estate entrepreneur and holds a real estate license in the State of Hawaii from 2005 to present.  In 2003, Mr. Taylor received his Microsoft technology certification from the Veterans Association during rehabilitation process from being injured in the military.  As part of his passion for open water scuba and snorkeling, he launched Liquid Marlin LLC, and works with the Make A Wish Foundation on Maui as one of its designated snorkel instructors.

30.     Defendant J. Taylor is the brother of Defendant D. Taylor.

31.     Upon information and belief, Defendant J. Taylor is a citizen of Hawaii.

**Defendant D. Taylor**

32.     Defendant Don L. Taylor ("D. Taylor") has served as the Company's CFO since December 2015.  He has also served as the Company's Treasurer and as a Company director since January 2016.  According to the Company's 2016 10-K, as of March 31, 2017, Defendant D. Taylor beneficially owned 13,047,019[6] shares of the Company's common stock, which represented approximately 28.76% of the Company's outstanding shares.  Given that the price per share of the

---

[5] Throughout this Complaint, emphasis is contained in original, unless otherwise stated.
[6] According to the Company's Form 8-K filed with the SEC on October 6, 2017, Defendant D. Taylor agreed to return 8,000,000 personal shares of Eco Science common stock to the Company for cancellation, effective September 22, 2017.

Company's common stock at the close of trading on March 31, 2017 was $3.39, D. Taylor owned over $44.2 million worth of Eco Science stock.

33.     For the fiscal year ended January 31, 2017, Defendant D. Taylor received $8,295,000 as compensation from the Company, which included $105,000 as base salary and $8,190,000 in stock awards.

34.     The Company's 2016 10-K stated the following about Defendant D. Taylor:

Mr. Don Lee Taylor

As CFO, Don Taylor will oversee the company's financial governance; business community content development program, and business partnerships. Mr. Taylor holds a real estate license in the State of Hawaii from 2001 to Present; and has been active in the Hawaii real estate and real estate financing community.  Mr. Taylor currently holds the title of Broker in Charge of Maui Realty Co., Inc. Mr. Taylor holds a BS in Finance with an emphasis in Financial Management from the California State University in Long Beach.

35.     Defendant D. Taylor is the brother of Defendant J. Taylor.

36.     Defendant D. Taylor is a citizen of Hawaii.

**Defendant Giguiere**

37.     Defendant Gannon Giguiere ("Giguiere") was the Managing Member of Phenix Ventures, LLC ("Phenix") and is the CEO of Separation Degrees – One, Inc. ("Separation Degrees").  Eco Science entered into a technology licensing and marketing support agreement with Separation Degrees and an equity purchase agreement with Phenix.

38.     Defendant Giguiere is a citizen of California.

**Defendant Lewis**

39.     Defendant L. John Lewis ("Lewis") has served as a Company director since June 21, 2017.  Per his employment agreement with the Company, Lewis is entitled to an annual salary of $120,000 per year and options to purchase 2,500,000 shares of Eco Science stock.

40.     The Company's Form 8-K filed with the SEC on June 26, 2017 stated the following about Defendant Lewis:

L. John Lewis

Mr. Lewis graduated Magna Summa Cum Laude from the University of Utah in 1976, with a Bachelor of Science degree in political science, and an international relations certificate.  He received a Juris Doctor degree from Stanford Law School in 1979, and was managing director of the Stanford Law Journal.  Following law school, Mr. Lewis served as a law clerk on both the United States District Court for the Southern District of California and on the United States Tenth Circuit Court of Appeals.

As a lawyer, Mr. Lewis has represented American Dairies, China Sky One, the Metropolitan Insurance Group, Skaggs-Alpha Beta, and numerous other companies in connection with private and public offerings, and/or mergers with public entities now trading on the New York Stock Exchange.

Mr. Lewis departed from the practice of law to become involved in assisting private companies with significant growth trajectories.  He has been active in assisting such companies with capital formation, structure and the private equity and business management for approximately the last twenty years as a consultant, legal advisor and/or manger, and has been the General Manager of a household products manufacturing company, the CEO of a nutraceutical company, and the Managing Director of a Swiss based asset management firm, as well as managing a large legal and contracting group for a multi-national NGO.  His management duties have run the gamut from managing a small business development group of several individuals to responsibility for hundreds of employees.

Mr. Lewis has served as an instructor of "International Legal and Treaty Conventions", "International Commercial Conflicts" for the United States Army, and was a part time Professor of Business Law at LDS Business College, as well as Visiting Instructor of Business Communications and Entrepreneurship" at the University of Utah.

Mr. Lewis has received the following honorary distinctions: (i) Owl and Key; (ii) Pi Sigma Alpha; and (iii) Who's Who in American Law.

41.     Defendant Lewis served as President of Ga Du Bank, Inc., and signed the May 2, 2017 Letter of Intent between Ga Du Bank, Inc. and Eco Science in such capacity.  On June 21, 2017, per the Stock Purchase Agreement, Lewis was appointed CEO of Ga Du Corporation.

42.     Upon information and belief, Defendant Lewis is a citizen of Utah.

**Defendant Oveson**

43.     Defendant S. Randall Oveson ("Oveson") has served as a Company director since June 21, 2017.  Per his employment agreement with the Company, Oveson is entitled to an annual salary of $120,000 per year and options to purchase 1,500,000 shares of Eco Science Stock.

44.     The Company's Form 8-K filed with the SEC on June 26, 2017 stated the following about Defendant Oveson:

S Randall Oveson

BS MBA • Management, Finance, and Accounting

Mr. Oveson started his career as a Financial Analyst with Suite Thinking, Inc., a boutique hospitality consulting firm in Newport Beach, CA. There Mr. Oveson developed systems and processes used to analyze dozens of hotels part of a $500 million+ portfolio in various financial and operational categories still in use in the hospitality industry today.

Upon completion of his MBA at Pepperdine University Mr. Oveson has taken CEO, COO, CFO, and CIO roles in hospitality, the aerospace, manufacturing, brokerage, action sports, telecommunications, and the banking and healthcare technology industries. His range of experience includes all aspects of management for start-up and mid-tier companies both public and private entities. He has led dozens of full financial audits and reviews and has also led numerous PCI audits and MasterCard RAMP reviews. He has been instrumental in projects as diverse as the first and largest prepaid CLEC in the State of California to building out and growing the first financial data center on the island of Antigua.

Mr. Oveson is currently involved in financial processing projects in Europe, Canada, and the US as well as assisting with the development of Ga Du Corporation's enterprise solutions and operations.

45.     On June 21, 2017, per the Stock Purchase Agreement, Oveson was appointed Chief Operating Officer of Ga Du Corporation.

46.     Defendant Oveson is a citizen of Utah.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

47.     By reason of their positions as officers, directors and/or fiduciaries of Eco Science and because of their ability to control the business and corporate affairs of Eco Science, the Individual Defendants owed Eco Science and its shareholders fiduciary obligations of trust, loyalty,

good faith, and due care, and were and are required to use their utmost ability to control and manage Eco Science in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Eco Science and its shareholders so as to benefit all shareholders equally.

48. Each director and officer of the Company owes to Eco Science and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Eco Science, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50. To discharge their duties, the officers and directors of Eco Science were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Eco Science, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the Individual Defendants who collectively comprised Eco Science's board of directors at all relevant times.

52.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the OTC, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to, *inter alia*, the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of Eco Science were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Eco Science were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, the United States, and pursuant to Eco Science's own Code of Ethics;[7]

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Eco Science conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

---

[7] The Company's 2016 10-K notes that the Company has adopted a Code of Ethics, but it is not publicly available.

Verified Shareholder Derivative Complaint

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Eco Science and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Eco Science's operations would comply with all laws and Eco Science's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.      Each of the Individual Defendants further owed to Eco Science and the shareholders the duty of loyalty requiring that each favor Eco Science's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Eco Science and were at all times acting within the course and scope of such agency.

56.     Because of their advisory, executive, managerial, and directorial positions with Eco Science, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Eco Science.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

58.     In committing the wrongful acts alleged herein, the Individual Defendants and Defendant Giguiere have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants and Defendant Giguiere caused the Company to conceal the true facts as alleged herein.  The Individual Defendants and Defendant Giguiere further aided and abetted and/or assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and aiding and abetting thereof; (ii) conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; (iii) engage in the Fraudulent Scheme; and (iv) artificially inflate the Company's stock price.

60.     The Individual Defendants and Defendant Giguiere accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully,

recklessly, or negligently conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The Individual Defendants and Defendant Giguiere collectively and individually initiated a course of conduct that was designed to and did conceal the facts that the Company engaged in the Fraudulent Scheme, the Company's strategic acquisitions plan lacked veracity, the Company made inadequate and inaccurate public statements concerning, *inter alia*, its potential acquisition of Ga Du Bank, and the Company failed to maintain adequate internal controls. Because the conduct described herein occurred under the authority and approval of the Board, each of the Individual Defendants who is a director of Eco Science was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.    Each of the Individual Defendants and Defendant Giguiere aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Defendant Giguiere acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Eco Science, and was at all times acting within the course and scope of such agency.

**INDIVIDUAL DEFENDANTS' AND DEFENDANT GIGUIERE'S MISCONDUCT**

**The Federal Securities Laws on Stock Promotion**

63.    The Individual Defendants' failure to disclose Eco Science's paid relationships with stock promoters ran afoul of Section 17(b) of the Securities Act of 1933.

64.     Section 17(b) – commonly known as the "anti-touting" provision – provides, in pertinent part, that anyone who advertises a stock, even if he does not purport to offer the security for sale, must disclose the "consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, the receipt, whether past or prospective, of such consideration and the amount thereof."  15 U.S.C. §77q(b).

65.     This anti-touting provision was enacted, in part, to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[8]

66.     In an investor bulletin published by the SEC titled "Microcap Stock: A Guide for Investors," the SEC provides information about investment in microcap stocks and specifically warns of potential fraud, explaining as follows:

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows . . . . The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.***

This SEC investor bulletin may be found at http://www.sec.gov/investor/pubs/microcapstock.htm. (Emphasis added.)

67.     Moreover, an issuer of securities is also required to disclose the details of its relationship with a stock promoter in its regulatory filings.  Here, Defendants' failure to disclose the stock promoters' receipt of compensation directly or indirectly from the Company for making material statements concerning Eco Science is a material omission and thus a violation of the Exchange Act.

---

[8] *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

18

**The Fraudulent Scheme**

68.     Defendants J. Taylor and D. Taylor caused the Company to engage in the Fraudulent Scheme, and Defendant Giguiere aided and abetted and rendered substantial assistance in the Fraudulent Scheme.

69.     The Company, per its website, "develops technical solutions that empower enthusiasts in their pursuit and enjoyment of building eco-friendly businesses and living healthy lifestyles" through products including consumer apps for daily use and enterprise software solutions.

70.     On January 12, 2016, the Company filed a Form 8-K with the SEC announcing that on January 1, 2016, the Company entered into a "technology licensing and marketing support agreement" with Separation Degrees[9] "that will result in the development, licensing and management of on-going technology solutions and marketing campaigns for ESSI's initiatives."  .

71.     As consideration for the transaction, the Company issued Separation Degrees 1,000 Series A Preferred Shares.  On the same date, the Company entered into an Asset Purchase Agreement with Separation Degrees whereby Eco Science acquired a proprietary messaging and customer relationship management software platform, issuing 500,000 shares of Eco Science common stock as consideration.  For the fiscal year ended January 31, 2017, the Company was invoiced by Separation Degrees for an amount exceeding $2 million, $1.7 million of which was for "advertising and promotion services" of Eco Science's brands, including Fitrix and Herbo.  Based

---

[9] Defendant Giguiere created Separation Degrees and appointed himself as CEO, and used Separation Degrees to award himself millions of shares in exchange for selling to Separation degrees a vague "software platform" consisting of "millions of lines of code" that never amounted to anything significant or noteworthy.  The IPO for Separation Degrees that would register Defendant Giguiere's shares never occurred, despite the registration statement for it being declared effective after considerable back-and-forth with the SEC.

on the evidence provided herein, the "service" provided by Separation Degrees was actually promotion of the Company's *stock*.

72.     The Company's subsequent SEC filings revealed several additional instances of shares being issued to Separation Degrees in addition to the initial 500,000 shares.  This included an additional 1.2 million shares as part of the Asset Purchase Agreement (as noted in the Company's Form 10-K filed with the SEC on May 17, 2016), 1.3 million shares as part of its consulting agreement with Separation Degrees (as noted in the Company's Form 10-Q filed with the SEC on June 20, 2016), and 7.5 million shares allocated for advertising services (as noted in the Company's Form 10-Q filed with the SEC on September 19, 2016).

73.     The Company's and Separation Degrees' collaboration resulted in two apps, titled "Fitrix" and "Herbo," respectively, being brought to market in 2016.  The Company's Form 10-K filed with the SEC on May 17, 2016 described Fitrix as "a powerful and flexible companion which helps users keep track of your day to day fitness routines, dietary habits and alternative medicine intake," and Herbo as an app "with a database of over 14,000 alternative medicine locations and delivery services, doctors who provide evaluations, and local shops that sell relevant product."

74.     Through a financial media company called The Money Street, Eco Science has caused to be published a series of articles that have outlandishly promoted the Company's stock, even noting that Eco Science has the potential to become the next Uber or Amazon of the cannabis industry.   As noted in a disclaimer in The Money Street's articles, The Money Street is compensated between $25,000 and $150,000 to publish such articles that pump-up the stock of the subject companies.   Notably, The Money Street also promoted the stock of a company that Defendant Giguiere was the CEO of, called Eventure Interactive, Inc ("Eventure Interactive").  Eventure Interactive, as discussed further herein, was a company set up in an identical way to Separation Degrees, whereby Defendant Giguiere awarded himself millions of shares of the

company's stock for the sale of a mysterious "software platform" that consisted of "millions of lines of code" that ultimately amounted to nothing of significance.

75.     From August 2016 to December 2016, the price per share of Eco Science stock rose *1,947%* (emphasis added).  Such a meteoric rise is inexplicable given the fact that by December 2016, the Company's business consisted of two YouTube channels with a combined six subscribers, and its Fitrix and Herbo apps only had 100 to 500 downloads each.  In fact, the only logical explanation for the increase in the Company's stock price is the Stock Promotion Scheme effectuated by the Individual Defendants and Defendant Giguiere.

76.     On January 18, 2017, the Company filed a Form 8-K with the SEC that noted that on January 10, 2017, the Company had entered into a Cancellation and Release Agreement with Separation Degrees concerning the technology licensing and marketing agreement, which as a result of the Company owed Separation Degrees $1,920,424 in unpaid fees.  Pursuant to the Cancellation and Release Agreement, the Company cancelled the unpaid fees in exchange for 4,000,000 shares of Company common stock.   Since the price per share of Company stock at closing on January 10, 2017 was $2.76, the $1,920,424 in unpaid fees turned into $11,040,000 worth of Eco Science stock for Separation Degrees.

77.     On January 26, 2017, the Company filed a Form 8-K with the SEC that noted that on January 15, 2017, the Company had entered into an Equity Purchase Agreement with Phenix, a company also owned by Defendant Giguiere, whereby Phenix agreed to purchase up to 10,000,000 shares of Company common stock upon "put notices" of the Company to Phenix and that the Company would file a Form S-1 Registration Statement with the SEC to register the 10,000,000 shares.

78.     The purchase price for the 10,000,000 shares would be "equal to 83% of the lowest volume weighted price for the ten consecutive trading days immediately following the date on

Verified Shareholder Derivative Complaint

which the applicable Put notice is delivered to Investor."   Notably, this financing deal was an almost identical replica of a toxic financing deal entered into by Eventure Interactive, which led Eventure Interactive's stock to plummet to zero.

79.     Thus, Defendant Giguiere, with already 4,000,000 shares as a result of the cancellation of the agreement with Separation Degrees, was, pending the filing of a registration statement, to receive an additional 10,000,000 shares of company stock at a discounted price, and would be able to sell them for a profit regardless of the fact that the stock was also concurrently being artificially inflated due to the Stock Promotion Scheme.  Sales of such large amounts of stock would also make the share price of Eco Science fall, to the detriment of the Company's shareholders.

80.     On January 27, 2017, the Company filed a Registration Statement on Form S-1 with the SEC, which was not declared effective by the SEC until May 12, 2017.  During the unusually long period before the Registration Statement was declared effective, the Company's stock price began to fall.  To prevent a further slide, the Company made the false and misleading statements as described further herein, including with regard to their plan to acquire Ga Du, which "the internet has never heard of," and which was operated through the SCNRFP, which is "not on the list of 566 Native American tribes legally recognized by the U.S."

81.     By May 2017, due in part to the Stock Promotion Scheme and the Company's small number of shares available for trading, the price per share of Eco Science common stock was up from around $0.25 to $2.40 over the preceding 12 months.

82.     Ultimately, Defendants D. Taylor and J. Taylor caused the Company to enter into sham-agreements with entities owned by Defendant Giguiere that would enable Defendant Giguiere to obtain millions of shares of Company stock, most at discounted prices, in exchange for essentially worthless software and code.  Such "transactions" merely masked the Stock Promotion

Scheme that promoted the Company's stock through unwarranted and unsubstantiated claims about the prospects of the Company's products. Thus, through the increase in the Company's stock price due to the Stock Promotion Scheme, Defendant Giguiere would be able to capitalize on the inflated value of his large Eco Science stock holding once a registration statement for those shares was declared effective by the SEC.

83.   While waiting on the registration statement to be approved by the SEC, Defendants D. Taylor and J. Taylor caused the Company to enter into another sham transaction with Ga Du Bank in order to combat a slide in the Company's share price, which, as described further herein, resulted in a suspension of trading in the Company's stock by the SEC. Even after the suspension, Eco Science has continued to promote the prospects of the Ga Du Corporation acquisition to inflate the Company's stock price as high as possible.

**False and Misleading Statements**

*December 2, 2016 Form 10-Q*

84.   On December 2, 2016, the Company filed a Form 10-Q with the SEC for the fiscal quarter ended October 31, 2016 (the "October 2016 10-Q"), which was signed by Defendant J. Taylor. The statements made in the October 2016 10-Q were materially false and misleading because they failed to disclose that: (1) the Company was furthering the Stock Promotion Scheme; and (2) Eco Science engaged in multiple transactions with entities owned by Defendant Gannon Giguiere to personally benefit him and support the Stock Promotion Scheme at the expense of the Company and the investing public. Instead, the October 2016 10-Q commented on the invoices the Company received from Separation Degrees for advertising services, stating, in relevant part:

> During the nine months ended October 31, 2016 the Company received invoices for advertising services from SDOI totaling $1,271,274 and further received invoices for monthly project and planned technical development/maintenance, production and staging server administration, ongoing marketing services and monthly advertising management services totaling a cumulative $322,000. The Company determined the value of the shares issuable to settle the total amounts

invoiced ($1,593,274) at a 30% discount to fair market value on the settlement date and recorded a loss of $684,748 in relation to the shares issuable.  During the nine months ended October 31, 2016 a total of 4,807,953 shares of common stock valued between $0.01 to 0.474 per share in relation to the aforementioned agreements with SDOI were issued. A total of $2,044,448 was recorded on the Company's balance sheets as liability for issuance of common shares (2016 - $108,510). The allocated shares had not yet been issued as at October 31, 2016.

85.     The October 2016 10-Q also discussed its financing of licensing support and maintenance fees, stating, in relevant part:

Plan of Operation

We have recently changed the focus of our business to operate in the eco-friendly technology sector using social media sites and offering apps to generate advertising revenues and download fees. The Company's need for ongoing capital by way of loans, sale of equity and/or convertible notes is expected to continue during the current fiscal year until we can establish revenues from operations. We are presently financing ongoing licensing support and maintenance fees associated with our newly commenced business focus by the issuance of shares of common stock for services at a discount to our market price.

86.     Attached to the October 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants J. Taylor and D. Taylor attesting to the accuracy of the October 2016 10-Q.

**December 15, 2016 Seeking Alpha Article**

87.     On December 15, 2016, *Seeking Alpha* published an article titled "Eco Science Solutions: Dangerously Promoted With Nearly 100% Downside," detailing the Company's involvement in the Stock Promotion Scheme.  In summary, the article noted:

**Summary**

- Eco Science Solutions has been the target of promotional articles.

- ESSI has a portfolio of assets that has little to no value.

- The Company generates no sales and has a significant debt load.

24

Eco Science Solutions (OTC:ESSI) is a pump-and-dump scheme with a 100 percent downside.  It is simply dumbfounding how ESSI has been able to garner an enterprise value of around $77 million with a portfolio of assets that has seemingly little to no value.

88.    The article described the Stock Promotion Scheme in detail, stating:

A financial media company called The Money Street (TMS) published a series of articles on Eco Science (here, here, and here), going so far as saying that ESSI has the potential to become the next Amazon (NASDAQ:AMZN) or Uber (Private:UBER) of the cannabis industry. What was hidden from the view of investors, however, was TMS's disclaimer at the bottom of the page . . . .

As the disclaimer clearly shows, TMS gets compensated between $25,000 and $150,000 to pump up stocks like ESSI… and looking at the stock chart below, ESSI has been pumped to the hilt:



89.    The article also described the Company's lackluster operations, stating, in relevant part:

**So… What Does ESSI Do?**

ESSI is tackling both the health and wellness industry and the cannabis market. By tackle, I mean the following: Developing two YouTube channels, which so far have a COMBINED subscriber base of six people; and managing two mobile apps, both of which have between 100 to 500 downloads on the Android market, and one of which has a five-star review written by some guy who just so happens to share the same name as ESSI's chief financial officer.

The growth story largely comes from ESSI's "Herbo" and "Fitrix" apps. Herbo uses the smartphone's GPS tracker to "help you find MMJ dispensaries, smoke

Verified Shareholder Derivative Complaint

shops, legal doctors, clinics, and delivery services in your area…". According to ESSI, the app has over 14,000 locations that make up the marijuana smoke chain.

The other app, Fitrix, "helps you keep track of your day-to-day fitness habits and routines." This app has features such as a BMI calculator, fitness radio, weight loss calculator, a daily log, and other generic features. According to an angry reviewer on the app store:

"This app has almost useless levels of functionality - for the parts that work. It seems more of a developer's first learning app than anything meant to be used… only plus is it's free so it can't hurt your wallet."

\* \* \*

It is also helpful to note just how easy it is to make mobile apps these days. For instance, a couple years ago, I decided to develop my own app. I knew nothing of app making, but for just a few hundred dollars, I was able to hire a programming and design team from India to develop an app from scratch. In just two weeks, the app was completed and was ultimately downloaded just a few hundred times, generating close to nothing in revenue. Perhaps, considering how richly valued ESSI is, my app should have also been worth a few million dollars as well!

90. In conclusion, the article noted a target price for Eco Science stock of $0.0, stating, in relevant part:

**Valuation and Conclusion**

The financial health of ESSI is the nail in the coffin. For starts, ESSI has not been able to generate ANY sales, and as a result, the company has burned through $12.5 million in shareholder capital since inception!

With only $70K in cash and almost $900K in payables on the balance sheet, the company will continue to cling to the capital markets for survival. An annual cash burn rate of +$200K also does not help.

Since it looks like the company will have no hope in successfully generating cash flow to support its significant debt load, my target price for ESSI is $0, or 100 percent down from the stock's current levels.

91. On this news, the price per share of Eco Science fell $0.13, or almost 5%, closing at $2.55 on December 16, 2016. By the close of market on December 20, 2016, just three trading days after the December 15, 2016 *Seeking Alpha* article was published, the price per share of Eco Science stock had fallen even further to $1.43.

26

*May 1, 2017 Form 10-K*

92.    On May 1, 2017, the Company filed the 2016 10-K, which was signed by Defendants J. Taylor and D. Taylor, and which presented a strategic acquisitions plan for Eco Science.  The statements made in the 2016 10-K were materially false and misleading because they failed to disclose that: (1) the Company was furthering the Stock Promotion Scheme; (2) Eco Science engaged in multiple transactions with entities owned by Defendant Gannon Giguiere to personally benefit him and support the Stock Promotion Scheme at the expense of the Company and the investing public;  and (3) that the Company's plan for strategic acquisitions lacked veracity. Instead, the 2016 10-K touted the Company's prospects in relation to potential strategic acquisitions and stated, in relevant part:

> The following is to provide a road-map for how the Company intends to prepare for and generate revenues, along with the costs associated to do so. Eco Science Solutions' core Initiatives are centered on five main areas: 1) continued consumer and enterprise technology investment, 2) continued product development through Scientific Research and Development; 3) inventory build for distribution, and *4) strategic acquisitions that provide an accelerated time-frame to secure market share*; 5) development of Sales, Customer and Finance personnel depth to support accelerated revenue growth.
>
> * * *
>
> *Strategic acquisitions – Due to various hyper-growth trends in segments of the holistic health and wellness category, Eco Science Solutions believes that it will be presented with unique investment and acquisition opportunities that are both synergistic and accretive to the Company. The Management Team has already identified several candidates. The Company has not budgeted an exact dollar amount for investment purposes in Strategic acquisitions over the next 12-month period.*

(Emphasis added).

93.    Attached to the 2016 10-K were SOX certifications signed by Defendants J. Taylor and D. Taylor attesting to the accuracy of the 2016 10-K.

*May 5, 2017 Press Release*

94.     On May 5, 2017, the Company issued a press release titled, "Eco Science Solutions, Inc. Signs Letter of Intent to Acquire Specialty Banking Operation," announcing the proposed acquisition of Ga Du Bank.  In the press release, the Company failed to disclose that: (1) they engaged in and/or caused the Company to engage in the Fraudulent Scheme; (2) the Company's strategic acquisitions plan lacked veracity; (3) Ga Du Bank was operated through the SCNRFP Central Bank; (4) the Chief of the SCNRFP had given approval for the acquisition; (5) Eco Science was in the process of performing due diligence for the potential acquisition of Ga Du Bank and had begun this process in early 2017; (6) Ga Du Bank's charter (which was provided through the SCNRFP) and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (7) the SCNRFP had made false representations to Ga Du Bank regarding its correspondent and merchant relationships; (8) Ga Du Bank, despite indicating otherwise to Eco Science, would not soon have a solution for banking with the SCNRFP; (9) thus, the Company made inadequate and inaccurate public statements concerning its potential acquisition of Ga Du Bank; and (10) the Company failed to maintain adequate internal controls.  Instead, the press release provided vague information regarding a potential acquisition of Ga Du Bank and misleadingly presented that the potential acquisition would allow the Company to "own and operate a financial banking division providing payment processing, cash management and financial services to its customers in the cannabis industry."  It stated, in relevant part:

> MAUI, HI--(Marketwired - May 5, 2017) - Eco Science Solutions, Inc. (OTCQB : ESSI ), an eco-technology Company providing solutions to the multi-billion-dollar health, wellness and alternative medicine industry, today announced that it has signed a Letter of Intent with Ga-Du Bank, Inc. for the purpose of acquiring full ownership of the Bank in a stock and cash transaction.

> Upon the closing of the transaction, ESSI will operate the Bank as a wholly-owned subsidiary of Eco Science Solutions, Inc. ESSI will own and operate a financial banking division providing payment processing, cash management and financial services to its customers in the cannabis industry.

Additionally, the Bank's principals have engaged with prospects in the marketplace whom have made expressions of interest, along with preliminary commitments to deposit sums between Three-Hundred and Six-Hundred Million Dollars ($300,000,000 and $600,000,000). These amounts are currently being projected to be deposited within the first sixty to one-hundred-eighty days following the acquisition of the Bank by ESSI.

"All parties involved are enthusiastic about the Bank's potential to financially serve the cannabis marketplace. Current business owners working in medical marijuana are doing a tremendous job, but are truly in need of formal banking services so they can soundly manage their business finances," stated John Lewis, who is both the current president of the Bank and a Governor of the Central Bank of SCNRFP. Mr. Lewis continued with, "By combining Ga-Du Bank with Eco Science Solutions, we see how our synergies will create an important financial institution to serve a category that is in need of a fully integrated vertical product suite."

"Our entire team is thrilled by the prospect of the acquisition of the Ga-Du Bank by ESSI," said Andy Tucker, Senior Advisor to of Ga-Du Bank. Mr. Tucker continued, "We believe that in joining forces with the ESSI team, we can deliver a comprehensive suite of financial products that addresses the current needs of currently what is a cash-driven industry, allowing ESSI to become a break-out leader for the sector."

95.     In the press release, Defendant J. Taylor touted how the acquisition would be a "game-changer" and put Eco Science "years ahead" of its goal," despite the fact that Ga-Du Bank was not capable of performing the various financial banking services noted in the press release.  He stated:

It has been our vision from day one that, in order to fully service the cannabis industry and execute on our business plan, we needed to be creative in securing and offering a banking platform that further differentiates us from everyone in our category [. . . .]  The deal with Ga-Du Bank is a game-changer for not only ESSI, but everyone in the cannabis industry. This new division of our Company will put us years ahead of our goal to create a full-service marketplace among growers, suppliers, distributors, retailers and consumers.

**May 12, 2017 Registration Statement**

96.     On May 12, 2017, the SEC declared effective the Company's Form S-1 Registration Statement for the issuance of stock to Phenix and Separation Degrees—over four months after the Registration Statement was initially filed.

**May 17, 2017 Seeking Alpha Article**

Verified Shareholder Derivative Complaint

97.     On May 17, 2017, *Seeking Alpha* published another article concerning Eco Science, titled "Eco Science Solutions: It's All Just A Little Bit Of History Repeating," outlining the Company's engagement in the Fraudulent Scheme and noting the relevance of the fate of Eventure Interactive, of which Defendant Giguiere was formerly the CEO, whose stock price dropped from $3.50 to $0.0 in 2014 after a series of toxic financing deals identical to the financing Eco Science obtained from Phenix.

98.     In summary, the article stated, in relevant part:

**Summary**

- Thanks to a small float and an ongoing stock promotion, Eco Science Solutions has been up over 700% over the last twelve months.

- Today, however, the size of its float has exploded overnight as a registration statement for 14 million newly issued shares has been declared effective.

- The person indirectly holding those shares has previously been CEO of Eventure, a publicly traded company with an uncanny number of similarities to Eco Science Solutions.

- Eventure's stock price dropped from 3.50 into the triple zeroes in 2014 after a series of toxic financing deals. Eco Science Solutions has now obtained identical toxic financing.

- I believe history will repeat itself and Eco Science Solution's stock will shortly follow Eventure's down the drain.

99.     The article provided relevant background into Eventure Interactive, which Giguiere had used to operate a pump-and-dump scheme, stating, in relevant part:

**2012-2015: Eventure Interactive**

This article starts in 2012, years before Eco Science Solutions ever even came to light.  That year an entrepreneur named Gannon Giguiere, and a fellow investor, sold a "software platform" to OTC-listed Live Event Media (OTCPK:EVTI), later renamed to Eventure Interactive. Giguiere, who received millions of shares in this transaction, also became Eventure's new CEO.

This mysterious software platform, with hardly any other description other than the fact it supposedly had "millions lines of code," was supposed to be Eventure's backbone in becoming "a social application development company."

However, despite a lot of talk about "vision" and "inspiration" and plenty of (stock) promotions, nothing ever materialized. Millions of investing dollars were wasted.

While Eventure Interactive did at one point manage to put out two barely functioning free apps, which never gained any traction whatsoever, it never generated any revenue. Most of all, it was a toxic printing press of stock. Before Giguiere became CEO in 2012, Eventure had 10.4 *million* shares outstanding. Late 2015, this number had increased to 1.4 *billion* shares.

After peaking at $3.60 late 2013, the Eventure share price plummeted straight to zero in the following months and years.

\* \* \*

This fall in share price was without a doubt caused by the many toxic financing deals Eventure agreed on. In little over a year, Eventure signed approximately ten different equity purchase or convertible note agreements (for example 1 2 3), in which outside financiers were allowed to buy or convert to EVTI stock at significant discounts to the share price, only to then proceed to dump the newly acquired shares in the open market. By far the most remarkable of those deals was with a mysterious entity named N600PG, which agreed to buy 10 million worth of stock at a hefty discount to the market price. However, remarkably, Gannon Giguiere was not only the President of Eventure Interactive at that time, but according to corporationwiki.com also a past Managing Member of this toxic financier. As far as I could find, the fact Giguiere might have had conflicting interests was never disclosed to shareholders.

100.    The article also described the fate of Eventure Interactive, stating, in relevant part:

In 2016, Eventure Interactive went "dark" and is now no longer filing with the SEC. While its shares are as of today still theoretically listed, it hardly ever trades anymore. Even though there are millions of shares on offer at $0.0001, there are simply no buyers left.

\* \* \*

At this point, the stock is merely waiting for its registration to be revoked by the SEC. All that's left is a large group of investors owning billions of worthless shares who at one point bought into the promises of Giguiere and his team, but are now left holding the bag having effectively lost all of their money.

101. The article noted and offered in support the December 15, 2016 *Seeking Alpha* article, stating, in relevant part:

> On the 15th of December 2016, author Anthony Thorpe published an article on Seeking Alpha about a company called Eco Science Solutions (OTC:ESSI). He convincingly argued shares are worthless. Anyone who has taken a few minutes to do some basic due diligence on Eco Science will agree with him. The company solely owns two extremely basic apps nobody uses or has even heard of. Nevertheless, Eco Science currently has a $110 million market cap.
>
> * * *
>
> In his article, Thorpe mainly focused on Eco Science itself, and its unlikely management. To really understand what's going on here, and to predict when the ESSI share price will finally dump for the last time before sinking away into oblivion, I suggest we look a bit deeper. In this article, I'll argue the company, as well as its management, are irrelevant and merely part of a vehicle that was set up to transfer shares to a third party. And in this case, that particular third party has pulled off an almost identical scheme just a few years ago, with that stock now trading at zero.
>
> Finally, I'll explain why I strongly believe the ESSI share price will follow that example, and why it will start its final, definitive descent to zero literally any day now.

102. Also discussed in the article was the creation of Separation Degrees, which Defendant Giguiere was also the CEO of and was set up in the same way as Eventure Interactive. The article stated, in relevant part:

> **2015: Separation Degrees – One**
>
> In January of 2015, when the share price of Eventure Interactive had already been spiraling down for some time, Giguiere apparently decided it was time to move on. He then filed with the SEC, through an S-1 registration statement, for the IPO of a completely new company called Separation Degrees - One. Giguiere appointed himself CEO, and took a large part of his team from Eventure Interactive with him, including Michael Rountree (Eventure's CFO) and Jason Harvey (Eventure's new CEO).
>
> The setup behind Separation Degrees was basically identical to the setup behind Eventure Interactive in many ways. Again, Giguiere had given himself millions of shares in this new venture in exchange for selling to the company a mysterious "software platform," consisting of (again) "millions of lines of code."

Unfortunately, for Giguiere and Separation Degrees, the SEC wasn't willing to play ball. In an initial response letter to the original filing, the SEC made thirty-nine(!) different comments. Among others, the SEC had a problem with the lack of proper disclosure, the lack of clarity with regards to the amount of customers (if any) the company had, the use of promotional language, and a large number of inconsistencies in the filing. Also, the SEC wanted to know "how the software platform sold by Mr. Giguiere [to Separation Degrees] differs from the platform [sold to Eventure Interactive]," as "we note the identical description of the assets purchased and that they are now owned by Eventure Interactive."

After going back and forth several times, and although Separation Degrees made a number of amendments to its filings, the SEC was still far from satisfied. In September 2015, it concluded:

> "[u]ntil a corrective amendment is filed, we will not perform a detailed examination of the registration statement and we will not issue comments because to do so would delay the review of other disclosure documents that do not appear to contain comparable deficiencies."

While the S-1 registration statement was eventually declared effective, it's no surprise the IPO of Separation Degrees - One never materialized.

103.     The article then dove into the transaction and ensuing relationship between Separation Degrees and Eco Science, stating, in relevant part:

*ESSI and Giguiere's Separation Degrees*

After the IPO of Separation Degrees - One fell through, Giguiere seems to have changed his plans. He no longer tried to IPO his own company, and instead appeared to change his focus to a company that's already listed. In January of 2016, Separation Degrees signed a "technology licensing and marketing support agreement" with an obscure, illiquid publicly traded entity called Eco Science Solutions, trading under the ticker ESSI. A majority stake in this company had (not coincidentally) just been bought by two brothers from Hawaii one month before (for more information on the Taylor brothers, see Anthony Thorpe's article). The agreement between Eco Science and Separation Degrees entailed, among others, for the third time this article, the sale of a mysterious "software platform."

Over 2016, the collaboration between Eco Science and Separation Degrees resulted in (again) two, very basic apps being brought to market, Herbo and Fitrix. Both apps are free, both are extremely basic (I personally tried Fitrix: by far the most impressive thing it does is offer an ability to calculate your Body Mass Index) and both are being downloaded or used by virtually nobody.

During 2016, Separation Degrees has send invoices to Eco Science totaling *over $2*

33

*million*. This includes $1.8 million in "advertising services." I have no idea what exactly was advertised. It surely weren't the apps, as even Google doesn't seem to know what, for example, the Fitrix app even is.

\* \* \*

But maybe Separation Degrees didn't advertise the apps on behalf of Eco Science, but instead advertised its stock. The website themoneystreet.com has been promoting ESSI stock for months now. Coincidentally (or not), that same website also used to promote EVTI stock.

\* \* \*

I've asked TheMoneyStreet if they have been compensated for running the ESSI promo, as they offer no clear disclosure. They did not reply.

Eco Science and Separation Degrees initially agreed invoices would be paid not in cash (which Eco Science doesn't have), but instead would be paid in shares. Later, both parties agreed to settle all outstanding invoices from 2016 by Eco Science issuing 4 million shares to Giguiere's Separation Degrees. At the current market price, these shares are worth about $10 million. Not a bad deal at all considering the original invoices amounted to about $2 million. However, it's important to realize these shares cannot legally be resold in the open market without a valid S-1 registration statement being approved by the SEC.

104.    The article then discussed the toxic transaction entered into between Phenix Ventures and Eco Science, stating, in relevant part:

In January of 2017, Eco Science also signed an Equity Purchase Agreement with an entity called Phenix Ventures LLC. By now, anyone reading this article will not be surprised that Phenix Ventures is ALSO in fact owned by Gannon Giguiere.

\* \* \*

The agreement states Eco Science will sell to Phenix ten million shares of the company's stock, at a price "equal to 83% of the lowest volume weighted price for the ten consecutive trading days immediately following the date on which the applicable Put notice is delivered to Investor."

Such an agreement is a fine example of toxic financing. Phenix gets to buy stock at a discount to the market price, sell those shares for a profit, which makes the share price fall, where Phenix is again able to buy at a discount, etcetera. Actually, it's the exact same type of financing that tanked the Eventure Interactive share price to zero.

And that's not where the similarities end. The Equity Purchase Agreement signed by Eco Science with Phenix is almost an exact copy of the Equity Purchase Agreement signed by Eventure Interactive with toxic financier N600PG two years previous . . . .

\* \* \*

Both deals through two separate entities have given Gannon Giguiere pole position in taking full advantage of the inflated Eco Science share price in the short term. He's now sitting on four million shares, plus has the right to acquire another ten million shares at a hefty discount, and sell them in the open market for a big profit. All it still takes is those shares being registered for re-sale.

105.    The article additionally described issues related to the Company's Registration Statement on Form S-1 filed with the SEC on January 27, 2017, and the issues concerning the Company's announced acquisition of Ga Du Bank, stating, in relevant part:

On January 26th, Eco Science filed with the SEC an S-1 registration statement. These registration statements are usually declared effective by the SEC within weeks, but on this occasion, it took close to four months, and two amendments.

As the ESSI share price began to slide during that unexpectedly long waiting period, the company made ever more desperate attempts to keep traders interested. This included a press release saying the company had signed a "Letter of Intent" to buy a bank, with supposedly "commitments" from prospects" "to deposit sums between $300 million and $600 million."

Sounds good? Well, the internet has never heard of this so-called "Ga-Du Bank," and it's regulated by (or, in fact, is; it's all a bit confusing to say the least) the newly founded Central Bank of the "Southern Cherokee Nation and The Red Fire People." Claiming to be a sovereign nation based on an 18th century US Supreme Court ruling (and quite possibly the only government in the world you can contact per e-mail through a Gmail-address), it's not on the list of 566 Native American tribes legally recognized by the US.

Apparently, even Eco Science itself wasn't too impressed: while it did send out a PR, it never filed an 8-K with the SEC, which is an obligation to public companies when they have material news to report. I agree with the company the banking business is immaterial (and, besides, of a questionable legality, but I'll leave that to the experts), but is most of all a poor attempt to distract investors from impending doom.

Anyway, I digress. By far, the most important news for ESSI shareholders over these last couple of months is the SEC has today declared the registration statement effective, making it possible for Giguiere to start selling stock legally now. Based on the uncanny number of similarities between Eventure Interactive

35

and Eco Science Solutions, I strongly believe history will repeat itself: Eco Science's extended run will soon be over. With dilution in full swing, I believe Giguiere will run yet another share price straight into the ground.

106.    In conclusion, the article stated that the Company "must be one of the most cynical publicly traded 'companies'" that the author had "ever come across," and the author provided his opinion on the dire prospects of the Company, stating, in relevant part:

**Conclusion**

Eco Science Solutions must be one of the most cynical publicly traded "companies" I've ever come across. While many OTC-listed small caps have very little substance, at least most of them fake doing something. Eco Science Solutions doesn't even bother. After having created two extremely basic apps and now apparently a move into tribal "banking," the company to me seems ready to move on to the real purpose of this operation: printing new stock.

With a small float, lots of volatility and several great "buy the dip" opportunities, ESSI stock has been a day trader's dream in 2016 and 2017. It's fundamentally worthless though, and it doesn't take a genius to see this. But there's no shortage of OTC stocks which are clear "zeroes." And most of them, like ESSI, have excessive borrow rates, which make shorting tremendously expensive. The most difficult question is not determining the value, but when the bubble will finally pop. If you're right about the value, but completely wrong about the timing, you'll likely lose anyway.

With the SEC now having declared effective the S-1 statement registering an additional 14 million shares in the hands of a person with, shall we say, a "colorful" history and a strong incentive to sell sooner rather than later, I believe the catalyst that will pop this bubble has finally arrived.

107.    On this news, the price per share of Eco Science stock fell $0.23, or 9.5%, from the previous day's closing price to close at $2.17 on May 16, 2017.

***May 19, 2017 SEC Release and Order***

108.    On May 19, 2017, the SEC issued a release announcing the temporary suspension of trading in the Company's securities due to "concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, ESSI's proposed acquisition of Ga-Du Bank, Inc."  The SEC release stated, in relevant part:

SECURITIES EXCHANGE ACT OF 1934

36

Release No. 80737 / May 19, 2017

The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of Eco Science Solutions, Inc. ("ESSI"), of Malawea, Hawaii at 9:30 a.m. EDT on May 22, 2017, and terminating at 11:59 p.m. EDT on June 5, 2017.

The Commission temporarily suspended trading in the securities of ESSI because of concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, ESSI's proposed acquisition of Ga-Du Bank, Inc. This order was entered pursuant to Section 12(k) of the Securities Exchange Act of 1934 (Exchange Act).

The Commission acknowledges FINRA's assistance in this matter.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to ESSI's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker-dealer or other person has any information which may relate to this matter, they should immediately contact Gerald Gross, Assistant Regional Director, New York Regional Office at (212) 336-0085 or Michael D. Paley, Assistant Regional Director, New York Regional Office at (212) 336-0145.

109.    On May 19, 2017, the SEC also issued the Order against the Company.  It stated that "there is a lack of current and accurate information concerning the securities of [the Company]" due to "concerns regarding the adequacy and accuracy" of information provided in its May 5, 2017 press release with regard to its potential acquisition of Ga Du Bank.  The Order noted, in relevant part:

Verified Shareholder Derivative Complaint

It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of Eco Science Solutions, Inc. (CIK No. 0001490873), a Nevada corporation with its principal place of business listed as Makawao, Hawaii with stock quoted on OTC Link, operated by OTC Markets Group Inc., under the ticker symbol ESSI, because of concerns regarding the adequacy and accuracy of information in a company press release dated May 5, 2017 relating to the company's proposed acquisition of Ga-Du Bank, Inc.

The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

### May 24, 2017 Form 8-K

110.   On May 24, 2017, the Company filed the 5-24-2017 8-K, which revealed pertinent information regarding the Company's proposed acquisition of Ga Du Bank and the inadequate and inaccurate statements made in the May 5, 2017 press release, as referenced by the SEC in the Order. The 5-24-2017 8-K specifically stated that the Company did not make clear in its May 5, 2017 press release that: (1) Ga Du Bank was operated through the SCNRFP Central Bank; (2) the Chief of the SCNRFP had given approval for the acquisition; and (3) Eco Science was in the process of performing due diligence for the potential acquisition of Ga-Du Bank.  The 5-24-2017 8-K stated, in relevant part:

On May 2, 2017, the Company entered into a Letter of Intent, with Ga-Du Bank, which operates through the Southern Cherokee Nation Red Fire People Central Bank (SCNRFP CB), operated by a Governing Board and Banking Oversight Secure Committee, of the Southern Cherokee Nation Red Fire People, to acquire the Ga-Du Bank.  The Letter of Intent is the framework for the Company and the Ga-Du bank to formalize the acquisition of the Ga-Du Bank following completion of the Company's due diligence. The Company has hired Attorney's Mark Skaist and Ben Frydman with the law firm of Stradling Yocca Carlson & Rauth, PC, specializing in corporate law and familiar with the banking industry.

A press release announcing the letter of intent was issued on May 5, 2017, **and it was not clear in the press release that the Ga-Du Bank is operated through the SCNRFP Central Bank; approval by the Chief of the SCNRFP for the acquisition of Ga-Du Bank has been given to the Company and the Company is now working through the due diligence process. Once the due diligence is complete, and approved by the Company, the Company will take further steps to close the transaction. In the event the due diligence is not favorable, the Company will not move forward with the transaction.** Both the Ga-Du bank and the Company are

working diligently to complete this transaction and once finalized, those documents will be filed.

(Emphasis added.)

111.    The 5-24-2017 8-K, however, failed to disclose that: (1) the Company's strategic acquisitions plan lacked veracity; (2) Ga Du Bank's charter (which was provided through the SCNRFP) and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (3) the SCNRFP had made false representations to Ga Du Bank regarding its correspondent and merchant relationships; (4) Ga Du Bank, despite indicating otherwise to Eco Science, would not soon have a solution for banking with the SCNRFP; (5) thus, the Company made inadequate and inaccurate public statements concerning its potential acquisition of Ga Du Bank; and (6) the Company failed to maintain adequate internal controls.

### Stock Resumes Trading

112.    On June 6, 2017, the Company's stock resumed trading, and closed at $0.65 per share on that day, which was decline of about $1.72, or 72.5%, from the closing price of the Company's stock on May 19, 2017, the date trading in the Company's stock was suspended.

### June 14, 2017 Form 10-Q

113.    On June 14, 2017, the Company filed a Form 10-Q with the SEC presenting the Company's financial results for the fiscal quarter ended April 30, 2017 (the "1Q 2017 10-Q"), which was signed by Defendant J. Taylor.   The statements made in the 1Q 2017 10-Q were materially false and misleading because they failed to disclose that: (1) the Company's strategic acquisitions plan lacked veracity; (2) Ga Du Bank's charter (which was provided through the SCNRFP) and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (3) the SCNRFP had made false representations to Ga Du Bank regarding its correspondent and merchant relationships; (4) Ga Du Bank, despite indicating otherwise to Eco Science, would not soon have a solution for banking with the SCNRFP; (5) thus,

the Company made inadequate and inaccurate public statements concerning its potential acquisition of Ga Du Bank; and (6) the Company failed to maintain adequate internal controls. Instead, the 1Q 2017 10-Q generally stated that the Company had entered into a Letter of Intent with Ga Du Bank and it hoped to close the transaction by the end of June 2017. The 1Q 2017 10-Q stated the following with regard to Ga Du Bank:

> On May 2, 2017, the Company entered into a Letter of Intent, with Ga-Du Bank, which operates through the Southern Cherokee Nation Red Fire People Central Bank (SCNRFP CB), operated by a Governing Board and Banking Oversight Secure Committee, of the Southern Cherokee Nation Red Fire People, to acquire the Ga-Du Bank. The Letter of Intent is the framework for the Company and the Ga-Du bank to formalize the acquisition of the Ga-Du Bank following completion of the Company's due diligence. The Company has hired Attorney's Mark Skaist and Ben Frydman with the law firm of Stradling Yocca Carlson & Rauth, PC, specializing in corporate law and familiar with the banking industry.

> The Company continues to work with Ga-Du Corporation regarding the acquisition of its banking services, and hope to close the transaction by the end of June 2017.

114. Attached to the 1Q 2017 10-Q were SOX Certifications signed by Defendants J. Taylor and D. Taylor, attesting to the accuracy of the 1Q 2017 10-Q.

**June 26, 2017 Form 8-K**

115. On June 26, 2017, the Company filed the 6-26-2017 8-K. The 6-26-2017 8-K revealed a litany of materially adverse facts that the Company had failed to disclose. The Company noted that its due diligence revealed that Ga Du Bank's "overall charter and [. . .] ability to engage in some of the desired commercial operations through the SCNRFP was not sufficiently developed by SCNRFP to meet the expectations of [the Company]," and, thus, the Company was not going to proceed with acquiring Ga Du Bank's banking charter. The 6-26-2017 8-K stated, in relevant part:

> Previously, on May 2, 2017, ESSI entered into a Letter of Intent with Ga Du Bank, a banking platform with a charter through the Southern Cherokee Nation Red Fire People ("SCNRFP"). After completing its due diligence, ESSI determined that while the banking platform technology was capable and had many advantages, *the overall charter and the ability to engage in some of the desired commercial operations through the SCNRFP was not sufficiently*

*developed by SCNRFP to meet the expectations of ESSI. In light of this, each of ESSI and Ga Du determined not to proceed with the acquisition of the banking charter.* Ga Du; however, has continued the refinement of its platform for data capture, financial services, and compliance platform, to develop mobile enterprise applications and to work with existing commercial banks, along with its other enterprise services activities.

(Emphasis added).

116.    The 6-26-2017 8-K revealed "several key representations" made by the Chief of the SCNRFP to Ga-Du Bank, including representations that "the SCNRFP had a correspondent relationship with HSBC Bank in London" and that "SNRFP's central bank was authorized by Visa and Master Card to engage in merchant transaction with cannabis merchants and would be acting as its own 'interchange' (payment processing)."   The 6-26-2017 8-K noted with regard to the "key representations":

> The Chief indicated that he believed that an opportunity existed to market banking and merchant services to cannabis merchants. As discussions developed, the Chief made several key representations: (i) that SCNRFP had opened a central bank (the "Central Bank"); (ii) that SCNRFP was a sovereign nation recognized by several other nations, and that this sovereignty had been clarified by opinion letter and treaty as to the United States; (iii) that SCNRFP had a correspondent relationship with HSBC Bank in London; (iv) that the Central Bank was authorized by Visa and Master Card to engage in merchant transactions with cannabis merchants and would be acting as its own "interchange" (payment processing); (v) that a charter from the Central Bank would permit Ga Du to engage in offering banking services; (vi) that SCNRFP would deposit up to $300 million in a bank to be organized by Ga Du if Ga Du was prepared to develop an automated security and compliance system, with funds transfer software capability.

117.    These "key representations," however, were misleading, particularly with regard to the representations about merchant and correspondent relationships.  The 6-26-2017 8-K stated, in relevant part:

> As Ga Du's relationship with SCNRFP developed, Ga Du continued a due diligence process and became involved in advising and assisting SCNRFP as to their banking proposal. *Ga Du discovered that the correspondent relationship and merchant relationships, despite representation, were not firm, and had not, in fact, been verified.*

41

(Emphasis added).

118.    Additionally, the 6-26-2017 8-K indicated that during the process leading up to the May 2, 2017 Letter of Intent, "Ga Du indicated to [the Company] that it believed that it would soon have a solution for cannabis banking with SCNRFP.  While Ga Du had received a license from SCNRFP it had not yet received an opinion letter as to sovereignty."  As the facts disclosed in the 6-26-2017 8-K reveal, the Company had no reasonable basis for making such a claim.

119.    The 6-26-2017 additionally addressed some fallout resulting from the Order, noting that the "SCNRFP terminated its relationship with Ga-Du."  The 6-26-2017 8-K, however, also noted that despite the issues with Ga Du Bank and the termination of its relationship with the SCNRFP, the Company had entered a stock purchase agreement to purchase all of the shares of Ga Du Corporation, making it a subsidiary of Eco Science:

> On June 21, 2017, Eco Science Solutions, Inc. (ESSI) entered into a Stock Purchase Agreement ("SPA") with the shareholders of Ga Du Corporation, a Nevada corporation ("Ga Du", "Sellers"), wherein, ESSI agreed to purchase, and Sellers agreed to sell 100% of the shares of capital stock of Ga Du to ESSI, in exchange of fifteen million (15,000,000) shares of ESSI Common Stock, that shall be issued to Seller's, pursuant to the SPA.

120.    As reasoning for the purchase, the Company cited the development of Ga Du Bank's technology platform and enterprise solutions business, and how the acquisition would "complete one segment of [the Company's] business plan" and potentially "create additional revenue streams for a combined entity," stating, in relevant part:

> Ga Du; however, has continued the refinement of its platform for data capture, financial services, and compliance platform, to develop mobile enterprise applications and to work with existing commercial banks, along with its other enterprise services activities. Ga Du's management team determined that the direction and vision of ESSI aligned with the interests of Ga Du, and seeing the potential to create additional revenue streams for a combined entity, the Ga Du management team agreed unanimously to become a subsidiary of ESSI and bring to market its other activities under the Eco Sciences brand. With the acquisition of Ga Du Corporation, ESSI has now acquired the Ga Du technology, along with its other activities such as Certified Laboratory Testing and Retail Inventory Control, bringing important enterprise technologies in-house.

* * *

Because Ga Du has developed a great many Enterprise Solutions, and in-roads to provide financial services to the Cannabis industry, Management believes there are tremendous complimentary aspects that, when combined, complete one segment of the ESSI business plan; exploration of eco-friendly technology and properties, which align with our health and wellness applications. Alongside of our Herbo Applications, moving forward in the cannabis industry and developing solutions that comport with the cannabis industry, may position ESSI to become a single source provider to consumers, dispensary owners/operators, smoke shops, and supporting professionals in the industry.

121.    In further touting the benefits of acquiring Ga Du, the 6-26-2017 8-K noted the "tremendous ecommerce and enterprise opportunities in front of a combined Eco Science Solutions and Ga Du," stating, in relevant part:

How Ga Du is related to ESSI's operating business

The Cannabis industry that ESSI and Ga Du are working to penetrate, remains fragmented, with rather small owner/operators, all whom are servicing their customer base with limited technologies, unsophisticated business processes and non-existent financial services. While forecasts have the Medical Marijuana industry as quite large, there remains a lack of technologies, business process and financial services that allow for the enterprise and the consumer to transact in an efficient manner. Management believes an analogy can be made that when Amazon.com entered into consumer retail market, the overall categories they targeted presented similar inefficiencies. This premise implies that there are tremendous ecommerce and enterprise opportunities in front of a combined Eco Science Solutions and Ga Du.

ESSI has developed, and offers, a consumer engagement application; e-wallet; location and delivery technologies; e-commerce platform; and a rich educational content platform.

Ga Du has developed, and offers, a security software to capture and retain customer and membership data, to accommodate KYC and compliancy matters for various kinds of financial services; a flexible mobile payment platform to facilitate payment for all kinds of services and products in collaboration with an experienced provider.

When combined, ESSI and Ga Du will have the capability to vertically satisfy the entire transaction flow from consumer to enterprise with a keen focus on the underserved Cannabis industry. The parties believe that this first mover advantage may give the Company a significant competitive advantage on a long-term basis.

122.    The 6-26-2017 8-K also disclosed Defendant Oveson's leading role in combining the

two entities, stating, in relevant part:

> Concurrently with work previously commenced on a proprietary banking and compliance software, Ga Du commenced to seek a correspondent relationship with various banks and to develop merchant processing relationship(s). During the later period of this process, Ga Du was introduced to Eco Science Solutions Inc. ("ESSI") by Mr. Randal Oveson. Mr. Oveson was aware of Ga Du's work with SCNRFP. Ga Du indicated to ESSI that it believed that it would soon have a solution for cannabis banking with SCNRFP. While Ga Du had received a license from SCNRFP it had not yet received an opinion letter as to sovereignty. Ga Du continued its development work on merchant processing and other payment solutions to assist merchants to avoid the handling of large amounts of cash, and on a depository system for taking cash deposits and digitizing such deposits.

123.    On September 14, 2017, Eco Science filed a Form 12b-25 Notification of Late Filing

with the SEC, stating that the Company "is unable to file, without unreasonable effort and expense,

its Quarterly Report on Form 10-Q for the quarter ended July 31, 2017 because the Registrant has

not yet been able to compile all the required financial data for the independent auditor to review."

124.    On October 6, 2017, Eco Science filed a Form 8-K with the SEC announcing that Ga

Du Corporation had entered into an agreement on September 22, 2017 with G&L Enterprises

wherein Ga Du Corporation was assigned "all of [G&L Enterprises'] rights, interest in, and

obligations under a License and Master Marketing Agreement" that G&L Enterprises had entered

into with Alliance Financial Network, Inc. ("Alliance"), a company that "provides certain financial

and marketing services to businesses and individuals, including the Cannabis industry."  The Form

8-K elaborated on the business of Alliance and how Alliance would provide the Company with

certain benefits, including the use of a marketing and financial services software platform, stating in

relevant part:

> Further, on September 22, 2017, Ga Du Corporation entered into an Assignment Agreement with G&L Enterprises, wherein G&L Enterprises assigned, to Ga Du Corporation, all of its rights, interest in, and obligations under a License and Master Marketing Agreement (LMMA) it entered into with Alliance Financial Network, Inc. ("AFN", "Alliance") on September 6, 2017.  The basic terms of that Agreement are as follows:

Alliance provides certain financial and marketing services to businesses and individuals, including the Cannabis Industry, on a programmatic or membership basis (the "Financial Program"), of which Alliance derives fees and income from enrolling companies in the Financial Program and providing a range of services, with respect to which AFN and Ga Du may derive fees and income, for such clients (the "Members") according to the AFN pricing schedule (the "Fees").

Alliance Financial Network is registered with FinCEN (MSB Registration Number: 31000094744769) as a financial services institution, compliant with the AML/BSA guidelines of FinCEN, and is regulated by the IRS. Operating a mobile application known as eXPO™ electronic eXchange Portal, Alliance provides financial and marketing services to businesses and individuals, which are challenged in the traditional banking systems, and generally are those that require more intensive compliance then banks are willing, or able to perform. One such industry is the cannabis industry; Alliance is configured to establish Membership relationships businesses in this industry following a full compliance audit on the business.

125.    The Company's October 6, 2017 Form 8-K also noted that Eco Science would issue 200,000 shares of Company stock to Alliance as a result of the transaction.

126.    As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at the time they were made, and this was known by the Individual Defendants or recklessly disregarded by them.

127.    Moreover, the Individual Defendants failed to timely correct these false and misleading statements and/or omissions of material fact.

128.    In breach of their fiduciary duties owed to Eco Science, Defendants J. Taylor and D. Taylor willfully or recklessly caused the Company to omit the foregoing adverse information in its public statements and caused the Company to fail to correct these public statements, and Defendants Lewis and Overson aided and abetted in said breach.

129.    In further breach of their fiduciary duties owed to Eco Science, Defendants J. Taylor and D. Taylor caused the Company to provide the Individual Defendants excessive compensation, and Defendants Lewis and Overson aided and abetted in said breach.

130.    In further breach of their fiduciary duties owed to Eco Science, J. Taylor and D. Taylor caused the Company to overpay via Company stock for the acquisition of Ga Du Bank, and Defendants Lewis and Overson aided and abetted in said breach.

131.    Also in breach of their fiduciary duties, Defendants J. Taylor and D. Taylor engaged in and/or caused the Company to engage in the Fraudulent Scheme, and Defendant Giguiere contributed directly to such breach, or aided and abetted such breach.

## **DAMAGES TO ECO SCIENCE**

132.    As a direct and proximate result of the Individual Defendants' conduct, Eco Science will lose and expend many millions of dollars.

133.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Actions filed against the Company and Defendants J. Taylor and D. Taylor, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134.    Such losses include losses related to the SEC's suspension of trading in the Company's securities.

135.    Such losses also include losses in potential revenues caused by customers' loss of trust in the Company's business and potential products and losses in potential investments caused by investors loss of trust in the Company's business and products.

136.    Such losses additionally include the overpayment by the Company of Company stock for the acquisition of Ga Du Bank.

137.    Moreover, such losses include the corporate assets wasted through the Fraudulent Scheme, especially through the Stock Promotion Scheme and through the significant amounts of common stock awarded to Defendant Giguiere's companies for essentially nothing in return.

138.     Such costs include, but are not limited to, compensation, bonuses, and/or benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, and/or aided and abetted said breach.

139.     As a direct and proximate result of the Individual Defendants' conduct, Eco Science has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

140.     Plaintiff brings this action derivatively and for the benefit of Eco Science to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers, and controlling shareholders of Eco Science and unjust enrichment, as well as the aiding and abetting thereof.

141.     Eco Science is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142.     Plaintiff is, and has been at all relevant times, an Eco Science shareholder. Plaintiff will adequately and fairly represent the interests of Eco Science in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

143.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

144.     A pre-suit demand on the Board of Eco Science is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following four Individual Defendants:

47

Defendants J. Taylor, D. Taylor, Lewis, and Overson (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to two of the four Directors who are on the Board at the time this action is commenced.

145.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material facts described herein, to provide themselves excessive compensation, and to overpay with Company stock for the acquisition of Ga Du Bank, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves.

146.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, and/or aided and abetted said breach, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

147.    All of the Directors are not independent because of the excessive compensation they receive and have received from the Company.

148.    Additional reasons that demand on Defendant J. Taylor is futile follow.  Defendant J. Taylor has served as the Company's President and CEO since December 2015.  He has also served as the Company's Secretary and as a Company director since January 2016.  As the Company admits in the 2016 10-K, he is a non-independent director.  Defendant J. Taylor was directly responsible for all of the wrongful conduct described herein, including making all of the false and misleading statements and omissions that were made (he personally made statements in the May 5,

2017 press release and signed the 2016 10-K). Indeed, Defendant J. Taylor is a defendant in the Securities Class Actions. As the CEO, President, Secretary, and a Company director, Defendant J. Taylor conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, he faces a substantial likelihood of liability. He received lavish compensation, including $8,305,000 for the fiscal year ended January 31, 2017. Defendant J. Taylor's large Company stock holding, worth over $44.2 million on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible. Defendant J. Taylor is part of the controlling shareholder group comprised of himself and D. Taylor that has controlled the Company via its collective ownership of 57.52% of the Company's voting power. The Board was entirely comprised of this controlling group until the acquisition of Ga Du Bank. He is thus not independent, and he is also beholden to D. Taylor, the other member of the controlling group. Furthermore, Defendant J. Taylor is the brother of Defendant D. Taylor, who is likely to face liability for the scheme outlined herein. Thus, for these reasons, too, Defendant J. Taylor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149. Additional reasons that demand on Defendant D. Taylor is futile follow. Defendant D. Taylor has served as the Company's CFO since December 2015. He has also served as the Company's Treasurer and as a Company director since January 2016. As the Company admits in the 2016 10-K, he is a non-independent director. Defendant D. Taylor was directly responsible for the wrongful conduct described herein, including making all of the false and misleading statements and omissions that were made (he personally made statements in the 2016 10-K). Indeed, Defendant D. Taylor is a defendant in the Securities Class Actions. As the CFO and a Company

director, Defendant J. Taylor conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, he faces a substantial likelihood of liability.  He received lavish compensation, including $8,295,000 for the fiscal year ended January 31, 2017.  Defendant D. Taylor's large Company stock holding, worth over $44.2 million on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible.  Defendant D. Taylor is part of the controlling shareholder group comprised of himself and J. Taylor that controls the Company via its collective ownership of 57.52% of the Company's voting power.  The Board was entirely comprised of this controlling group until the acquisition of Ga Du Bank.  He is thus not independent, and he is also beholden to J. Taylor, the other member of the controlling group.  Furthermore, Defendant D. Taylor is the brother of Defendant J. Taylor, who is likely to face liability for the scheme outlined herein.  Thus, for these reasons, too, Defendant D. Taylor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.   Additional reasons that demand on Defendant Lewis is futile follow.  Defendant Lewis has served as a Company director since June 21, 2017.  He is entitled to receive lavish compensation, including an annual salary of $120,000.  Defendant Lewis is also entitled to potentially receive 2,500,000 shares of the Company's common stock.  Furthermore, on June 21, 2017, Defendant Lewis was appointed the CEO of Ga Du Corporation.  Thus, his livelihood is dependent on the aforementioned controlling shareholder group comprised of directors who are not disinterested.   As a Company director, Defendant Lewis aided and abetted Defendants J. Taylor's and D. Taylor's breaches of fiduciary duty.  Defendant Lewis, due to his employment with Ga Du Bank, supported the other Individual Defendants' failures to disclose the material adverse facts as

discussed herein because he knew that Ga Du Bank would not be able to provide the Company with the financial banking services it desired and had represented it would obtain in its public statements. Yet he was aware that the making of such false statements helped effectuate the acquisition of Ga Du Bank, Inc., which acquisition he benefited from.  Thus, for these reasons, too, Defendant Lewis aided and abetted Defendants J. Taylor's and D. Taylor's breaches of fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Oveson is futile follow.  Defendant Oveson has served as a Company director since June 21, 2017.  He is entitled to receive lavish compensation, including an annual salary of $120,000.  Defendant Oveson is also entitled to potentially receive 1,500,000 shares of the Company's common stock.  Furthermore, on June 21, 2017, Defendant Oveson was appointed the Chief Operating Officer of Ga Du Corporation.  Thus, his livelihood is dependent on the aforementioned controlling shareholder group comprised of directors who are not disinterested.   As a Company director, Defendant Oveson aided and abetted Defendants J. Taylor and D. Taylor's breaches of fiduciary duty.  Defendant Oveson, due to his prior employment or association with Ga Du Bank, supported the other Individual Defendants' failures to disclose the material adverse facts as discussed herein because he knew that Ga Du Bank would not be able to provide the Company with the financial banking services it desired and had presented in its public statements.  Yet he was aware that the making of such false statements helped effectuate the acquisition of Ga Du Bank, Inc., which acquisition he benefited from.  Thus, for these reasons, too, Defendant Oveson aided and abetted Defendants J. Taylor's and D. Taylor's breaches of fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on the Board is futile follow.

153.    Demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  Defendants J. Taylor and D. Taylor comprise a controlling group of the Company and served as the Company's sole executives and directors until the acquisition of Ga Du Bank.  As such, they were directly responsible for the scheme engaged in as discussed herein.  Thus, Defendants J. Taylor and D. Taylor are interested and face a substantial likelihood of liability, and therefore any demand upon them is futile.

154.    Defendants Lewis and Oveson aided and abetted the Fraudulent Scheme through their roles as officers of Ga Du Bank, assisting in the acquisition of Ga Du Bank by the Company, the promotion of which was used to further buttress the price of the Company's stock.  Through their roles in effectuating the Ga Du Bank acquisition, Defendants Lewis and Oveson have caused harm to the Company and its shareholders through, *inter alia*, damage to Eco Science's reputation, waste of assets, and contributing to conduct resulting in the Securities Class Actions.  Thus, Defendants Lewis and Oveson face a substantial likelihood of liability, and demand is futile as to them.

155.    Moreover, Defendants Lewis and Oveson are not disinterested due to the benefits they received and continue to receive from Eco Science's dealings with Ga Du Corporation.  Defendants Lewis and Oveson, who were appointed to serve as CEO and Chief Operating Officer of Ga Du Corporation after it was acquired by Eco Science, respectively, and who served as President of and who was responsible for the operations of Ga Du Bank before the acquisition, respectively, were instrumental in arranging for Eco Science's acquisition of Ga Du Corporation, which unfairly benefited Ga Du Corporation to Eco Science's detriment,.  Because Defendants Lewis and Oveson had important positions at Ga Du Bank, which was owned by Ga Du Corporation, they *were* dependent on Ga Du Corporation, and thus were not disinterested in deciding to effect this unfair acquisition.  They *are* also not disinterested, as well as not

independent, because as a result of their causing the unfair acquisition, they received not only directorships at Eco Science, but valuable executive positions at Ga Du Corporation.   Thus, Defendants Lewis and Oveson are not disinterested, and demand as to them is futile, and excused.

156.   Eco Science does not have a standing Audit Committee or Compensation Committee.  Instead the Board performs all functions that would otherwise be performed by these committees.  Thus, the Board, and especially Defendants J. Taylor and D. Taylor who were the sole members of the Board while much of the wrongdoing alleged herein occurred and who now comprise half of the Board membership, face a substantial likelihood of additional liability for the Company's scheme as discussed herein, including the false and misleading statements, failure to maintain adequate internal controls, and unjust enrichment of the Directors and Company's officers.  Thus, any demand upon them is futile.

157.   Defendants J. Taylor and D. Taylor each received compensation exceeding $8.29 million for the fiscal year ended January 31, 2017. In light of their engagement in the wrongdoing alleged herein, their compensation was excessive and they face a substantial likelihood of liability for awarding themselves such improper compensation and would not be disinterested in considering a demand to recoup the money from themselves.  Thus, any demand upon Defendants J. Taylor and D. Taylor is futile.

158.   Defendants Lewis and Oveson were appointed to executive positions with Ga Du Corporation pursuant to the Stock Purchase Agreement.  Due to their positions as CEO and Chief Operating Officer of Ga Du Corporation, respectively, Defendants Lewis and Oveson are not independent.  Thus, any demand upon Defendants Lewis or Oveson is futile.

159.   The Directors have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders.  The relationship between Directors J. Taylor and D. Taylor is particularly strong as

they are brothers.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors is futile.

160.    Eco Science has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Eco Science any part of the damages Eco Science suffered, and will continue to suffer, thereby.  Thus, any demand on the Directors is futile.

161.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

162.    The acts complained of herein constitute violations of fiduciary duties owed by Eco Science's officers and directors, and these acts are incapable of ratification.

163.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Eco Science.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-

Verified Shareholder Derivative Complaint

versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Eco Science, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

164.    If there is no directors' and officers' liability insurance, then the Directors will not cause Eco Science to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

165.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least two of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Defendants J. Taylor and D. Taylor for Breach of Fiduciary Duties**

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    Defendants J. Taylor and D. Taylor owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Eco Science's business and affairs.

168.    Defendants J. Taylor and D. Taylor violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.    Defendants J. Taylor's and D. Taylor's conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as

Verified Shareholder Derivative Complaint

alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Eco Science.

170.    In breach of their fiduciary duties, Defendants J. Taylor and D. Taylor engaged in and/or caused the Company to engage in the Fraudulent Scheme.

171.    Also, in breach of their fiduciary duties owed to Eco Science, Defendants J. Taylor and D. Taylor willfully or recklessly made and/or caused the Company to make false and misleading statements and fail to disclose that: (1) they engaged in and/or caused the Company to engage in the Fraudulent Scheme; (2) the Company's strategic acquisitions plan lacked veracity; (3) Ga Du Bank was operated through the SCNRFP Central Bank; (4) the Chief of the SCNRFP had given approval for the acquisition; (5) Eco Science was in the process of performing due diligence for the potential acquisition of Ga Du Bank and had begun this process in early 2017;  (6) Ga Du Bank's charter (which was provided through the SCNRFP) and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (7) the SCNRFP had made false representations to Ga Du Bank regarding its correspondent and merchant relationships; (8) Ga Du Bank, despite indicating otherwise to Eco Science, would not soon have a solution for banking with the SCNRFP; (9) thus, the Company made inadequate and inaccurate public statements concerning its potential acquisition of Ga Du Bank; and (10) the Company failed to maintain adequate internal controls.   Defendants J. Taylor and D. Taylor also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

172.    Defendants J. Taylor and D. Taylor had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Eco Science's securities.

173.    Defendants J. Taylor and D. Taylor had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  Defendants J. Taylor and D. Taylor had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Eco Science's securities.

174.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

175.    As a direct and proximate result of the Defendants J. Taylor's and D. Taylor's breaches of their fiduciary obligations, Eco Science has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants J. Taylor and D. Taylor are liable to the Company.

176.    Plaintiff on behalf of Eco Science has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants and Defendant Giguiere for Unjust Enrichment**

177.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and Defendant Giguiere were unjustly enriched at the expense of, and to the detriment of, Eco Science.

179.    The Individual Defendants and Defendant Giguiere either benefitted financially from the improper conduct, and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Eco Science that was tied to the performance or artificially inflated valuation of Eco Science, and/or received compensation or otherwise received payments that was unjust in light of the Individual Defendants' and Defendant Giguiere's bad faith conduct.

180.    Plaintiff, as a shareholder and a representative of Eco Science, seeks restitution from the Individual Defendants and Defendant Giguiere and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-based compensation obtained by the Individual Defendants and Defendant Giguiere due to their wrongful conduct and breach of their fiduciary duties.

181.    Plaintiff on behalf of Eco Science has no adequate remedy at law.

## THIRD CLAIM

### Against Defendants J. Taylor and D. Taylor for Abuse of Control

182.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.    Defendants J. Taylor's and D. Taylor's misconduct alleged herein constituted an abuse of their ability to control and influence Eco Science, for which they are legally responsible.

184.    As a direct and proximate result of the Defendants J. Taylor's and D. Taylor's abuse of control, Eco Science has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty,

Eco Science has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants J. Taylor and D. Taylor are liable to the Company.

185.   Plaintiff on behalf of Eco Science has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants J. Taylor and D. Taylor for Gross Mismanagement

186.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.   By their actions alleged herein, Defendants J. Taylor and D. Taylor, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Eco Science in a manner consistent with the operations of a publicly-held corporation.

188.   As a direct and proximate result of Defendants J. Taylor's and D. Taylor's gross mismanagement and breaches of duty alleged herein, Eco Science has sustained and will continue to sustain significant damages.

189.   As a result of the misconduct and breaches of duty alleged herein, Defendants J. Taylor and D. Taylor are liable to the Company.

190.   Plaintiff, on behalf of Eco Science, has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants J. Taylor and D. Taylor for Waste of Corporate Assets

191.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants J. Taylor and D. Taylor have caused Eco Science to waste valuable corporate assets, to pay themselves excessive compensation, to overpay with

Company stock for the acquisition of Ga Du Bank, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

193.    Defendants J. Taylor and D. Taylor additionally caused the Company to waste valuable corporate assets through the Fraudulent Scheme, especially through the Stock Promotion Scheme and through the significant amounts of common stock awarded to Defendant Giguiere's companies for essentially nothing in return.

194.    As a result of the waste of corporate assets, Defendants J. Taylor and D. Taylor are each liable to the Company.

195.    Plaintiff on behalf of Eco Science has no adequate remedy at law.

## SIXTH CLAIM

**Against Individual Defendants and Defendant Giguiere for Aiding and Abetting Breach of Fiduciary Duty**

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    To the extent any Individual Defendants did not breach their fiduciary duty, such Individual Defendants aided and abetted the Individual Defendants who breached their fiduciary duty to Eco Science.

198.    To the extent Defendant Giguiere did not engage in the misconduct alleged herein, Defendant Giguiere aided and abetted the Individual Defendants who breached their fiduciary duty to Eco Science.

199.    The Individual Defendants' and Defendant Giguiere's misconduct resulted in continuous, connected, and on-going harm to the Company.

200.    Specifically, Defendants Lewis and Oveson had knowledge of Eco Science's directors' and officers' breaches of fiduciary duty due to their prior respective employments and

associations with Ga Du Bank/Ga Du Corporation, Defendants Lewis and Oveson had knowledge of Eco Science's directors' and officers' breaches of fiduciary duty.  Moreover, the making of their false statements helped effectuate the acquisition of Ga Du Bank, Inc., which acquisition they benefited from.

201.    Defendants Lewis, Oveson, and Giguiere participated in Defendants J. Taylor's and D. Taylor's breaches of fiduciary duty by supporting Defendants J. Taylor's and D. Taylor's engagement in the Fraudulent Scheme and failures to disclose material adverse facts as discussed herein, while being aware that Ga Du Bank would not be able to provide the financial banking services that Eco Science sought and had presented in its public statements or that the Company was engaging in toxic transactions for the benefit of Defendant Giguiere.  Defendants Lewis and Oveson consulted with Defendants J. Taylor and D. Taylor regarding the status of Ga Du Bank as a viable route to Eco Science providing financial banking services and Eco Science's public disclosures.  Defendant Giguiere personally benefitted from and was materially involved in the Company's transactions with Defendant Giguiere's companies that damaged the Company and the false and misleading statements as outlined herein.

202.    Defendants Lewis and Overson also specifically aided and abetted Defendants J. Taylor's and D. Taylor's causing the Company to overpay via Company stock for the acquisition of Ga Du Bank in breach of their fiduciary duties.

203.    Defendant Giguiere also aided and abetted Defendants J. Taylor's and D. Taylor's causing the Company to waste Company stock in its sham transactions with Separation One and Phenix in breach of their fiduciary duties.

204.    The Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public

Verified Shareholder Derivative Complaint

statements disseminated by Eco Science, and had the power and/or ability to directly or indirectly control or influence one another.

205.     Each Individual Defendant is jointly and severally liable to the same extent as any other Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

206.     Defendant Giguiere is liable to the same extent as any other Defendant is liable for violations of laws set forth herein.

207.     As a direct and proximate result of Defendants Lewis, Giguiere, and Oveson's aiding and abetting of Eco Science's directors' and officers' breaches of duty alleged herein, Eco Science has sustained and will continue to sustain substantial damages.

208.     Plaintiff on behalf of Eco Science has no adequate remedy at law.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Eco Science, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Eco Science;

(c)     Determining and awarding to Eco Science the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Eco Science and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Eco Science and its shareholders from a repeat of the damaging

events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

    2.  a provision to permit the shareholders of Eco Science to nominate at least two candidates for election to the board; and

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding Eco Science restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: November 2, 2017                   Respectfully submitted,

LEVERTY & ASSOCIATES LAW CHTD.

*Patrick Leverty*
_____
Patrick R. Leverty, Esq., NV Bar No. 8840
832 Willow Street
Reno, NV 89502
*Liaison Counsel for Plaintiff*

THE ROSEN LAW FIRM, P.A.
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

<u>VERIFICATION</u>

I, Hans Menos, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 19th day of October, 2017.



Hans Menos